IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LISANDRO PATRICK,

    Petitioner,

    v.

NOELIA RIVERA-LOPEZ,

    Respondent.

CIVIL NO. 12-1501 (CVR)

## OPINION AND ORDER

### PROCEDURAL BACKGROUND

Petitioner Lisandro Patrick (hereafter "petitioner Patrick") is a national of the Dominican Republic and a Dutch citizen, who was permanently residing in the United Kingdom (England) when he filed the petition under Hague Convention for the return of minor child L.N.R. on June of 2012. Petitioner claims respondent Noelia Rivera-López (hereafter "respondent Rivera"), the mother of the infant, wrongfully removed L.N.R. on March 6, 2012 from England to Puerto Rico without petitioner's consent.  (Docket No. 1).

On June 8, 2010, petitioner Patrick and respondent Rivera were married in Puerto Rico, after L.N.R. had been born.  Petitioner Patrick submits that, upon their marriage, he moved to England to set up a family  home where Respondent and her minor children joined him on January 11, 2011. (*Id.*).  As such, petitioner Patrick alleges the parties are all permanent residents of the United Kingdom where Petitioner has been employed as a sales assistant, while he was attempting to convert his teaching qualifications so that he could

begin working as a primary school teacher in the United Kingdom.  Petitioner Patrick submits that, since January of 2011, all the parties above mentioned have been living in the United Kingdom as a family until March 6, 2012 when respondent Rivera wrongfully removed the child L.N.R., and together with her older child, moved back to Puerto Rico. After several attempts to contact Respondent, by March 11, 2012 she notified Petitioner they would not be returning to the United Kingdom.

On June 22, 2012, petitioner Patrick filed this action under the Hague Convention on the Civil Aspects of International Child Abduction, an international treaty among the United States and fifty other countries, including England as signatories.  *See Hague Convention on the Civil Aspects of International Child Abduction, opened for signature* October 25, 1980, T.I.A.S. 11,670, *reprinted in* 51 Fed.Reg. 10,494 (March 26, 1986). (Docket No. 1).

In sum, Petitioner avers Respondent wrongfully removed the child L.N.R. from their habitual place of residence England in breach of Petitioner's rights of custody.  Since Petitioner claims he should be considered the father of the child under the laws of England, this petition was filed to request the return of the child for Petitioner never consented to L.N.R.'s removal.

After the Court appointed *pro bono* counsel for Respondent and initially scheduled the evidentiary hearing, the parties consented to jurisdiction by a Magistrate Judge.

(Docket Nos. 25, 26 and 27).  On September 3, 2012, respondent Rivera answered the Complaint.  (Docket No. 30).  On October 11, 2012,  a settlement conference was held in which the non-jury trial was set.

On the same day, respondent Rivera filed a First Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The most relevant ground for the request for dismissal of the petition stemmed from petitioner Patrick's non-compliance with the Hague Convention's requirements to institute the petition for the return of the child for he was not exercising the rights of custody or its equivalent in that he had not been granted parental responsibility as to minor  L.N.R.  (Docket No. 50).

Petitioner Patrick requested an extension of time to file a reply to the motion to dismiss.  On November 5, 2012, said opposition was filed.  (Docket No. 55).

On November 8, 2012, the motion to dismiss was granted on the ground that Petitioner failed to comply with the requirements of wrongful removal under the Hague Convention inasmuch as Petitioner was not exercising the rights of custody or its equivalent in that he had not been granted parental responsibility as to minor L.N.R.  (Docket No. 56). Judgment was entered accordingly thereafter.  (Docket No. 58).

Petitioner Patrick timely appealed.  On February 1, 2013, the Court of Appeals for the First Circuit reversed and ruled that "Patrick has 'parental responsibility' for L.N.R. under United Kingdom law, which means that he has 'rights of custody' under the Hague Convention. The district court erred when it dismissed Patrick's petition on the grounds that he did not have rights of custody." Lisandro Patrick v. Noelia Rivera-López, ___ F.3d.

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 4

_____ (1st Cir. 2013), 2013 WL 388053.  The Court of Appeals remanded the case with instructions to conduct a trial as soon as possible indicating the trial would presumably address the issues raised in Rivera's answer to the petition, to wit, "her contentions that the United Kingdom was not L.N.R.'s habitual residence, that returning L.N.R. to the United Kingdom would expose her to a grave risk of harm, and that Patrick consented to L.N.R.'s return to the United States."  *Id*.  The Mandate was issued on same day.  (Docket No. 69).

The trial was immediately set for February 11, 2013.  However, the parties jointly requested a telephone conference with the undersigned in which Petitioner's counsel moved the court for the Non Jury Trial to be re-set for February 22, 2013 which would allow Petitioner to travel to Puerto Rico the day before on a less expensive airfare.  Accordingly, per agreement of the parties, the Non Jury Trial was re-set for February 22, 2013 at 9:00 am.  (Docket No. 71).

On February 22, 2013, the Non-Jury Trial was held as scheduled.  Petitioner Patrick testified on his own behalf and several exhibits were admitted.[1]  In turn, respondent Rivera also testified.  Respondent's in *forma pauperis* request was previously approved by the Court and, as such, she was provided with the services of a court interpreter during the trial.  (Docket No. 90).

### FACTUAL STIPULATIONS

The following stipulations were proposed by the parties (Docket No. 84-1) and are herein adopted as part of the Court's factual findings:

---

[1] *See* Exhibit List at Docket No. 91.

1.      Patrick and Rivera are the biological parents of the child L.N.R.

2.      On June 2, 2009, the child was born in Mayaguez, Puerto Rico.[2]

3.      The child was registered solely by Rivera.[3]

4.      Patrick is not registered in the child's birth certificate.[4]

5.      On June 8, 2010, the parties married in Lajas, Puerto Rico.

6.      On January 11, 2011, Rivera traveled to England with her children.[5]

7.      On March 6, 2012, Rivera and the children returned to Puerto Rico.

In addition, the Court makes the following findings of fact based on the testimonies, the exhibits and the evidence presented at the trial:

1.      On December 28, 2008, Petitioner executed an affidavit acknowledging under oath he is the father of L.N.R. and Respondent acted as a witness. (Trial Exhibit 1).

2.      Respondent has another child from a previous relationship L.D.R., born in 2005 who is not the subject of this petition.  Petitioner is not the biological father of L.D.R.

3.      L.D.R. was admitted to school in the United Kingdom by the Bracknell Forest Council as shown in Trial Exhibit 5 dated October 4, 2011.

---

[2] *See* Trial Exhibit 2.

[3] *See* Trial Exhibit 3.

[4] *See* Trial Exhibit 3.

[5] *See* Trial Exhibit 13A and 13B.

4.    Petitioner was born in the Dominican Republic and is a Dutch citizen who resides permanently in the United Kingdom.

5.    Respondent and her two children are United States' citizens.  (Trial Exhibits 13A and 13B).

6.    Respondent and L.N.R. obtained visitors visas for the United Kingdom in January 11, 2011.  (Trial Exhibits 13A and 13B).

7.    On August 3, 2011, Respondent and L.N.R. obtained each a "Residence Card of a Family Member of an SEA National" valid until August 3, 2016.  (Trial Exhibits 13A and 13B).

8.    Petitioner has a Bachelor's degree in primary school teaching and an Associate's degree in religion.  Petitioner has started the process of converting his teaching qualification to be accepted in the United Kingdom and when his qualification is converted, he plans to be working as a primary school teacher in the United Kingdom.

9.    Petitioner, Respondent, L.N.R and L.D.R. lived together in England from January 11, 2011 until March 6, 2012.

10.    L.D.R. attended primary school in the United Kingdom. (Trial Exhibit 5).

11.    Petitioner, Respondent and both children are registered for and receive medical care through the National Health Service in the United Kingdom. (Trial Exhibit 6).

12.    Petitioner, Respondent and both children received Child Benefit from the government of the United Kingdom.  (Trial Exhibit 7).

13.    The parties applied to the United Kingdom Border Agency for the United Kingdom Residence cards for Respondent and both children in June of 2011. (Trial Exhibit 8).

14.    Respondent was taking English classes in the United Kingdom to improve her English skills.

15.    On the morning of March 6, 2012, Respondent told Petitioner she was taking L.D.R. to school and then going to her English class. This was Respondent's typical routine.  She would usually take L.N.R. with her to the English classes where child care was provided while she took her lessons.

16.    Petitioner was not employed at the time and was under the "job seekers" allowance so he went out for the day to look for work and apply for jobs.

17.    When Petitioner returned to his house that day the house looked like if Respondent and the children had not been home all day.

18.    At first, Petitioner did not think anything was wrong and assumed Respondent had stayed away from the house longer than usual.

19.    When Respondent and the children did not return home, Petitioner became worried, called his brother and the police.

20. Petitioner went to L.D.R.'s school where he was told Respondent called the school that day and informed L.D.R. was sick and was not attending school that day.

21. L.D.R. did not attend school that day.

22. Petitioner noticed the passports of Respondent and the children, her computer and other personal items were missing from the house.

23. Respondent's passport and those of the children were kept in a kitchen drawer at the family home along with other documents.  The kitchen drawer was not locked or secured.

24. Respondent had a mobile phone and Petitioner tried to contact her on her mobile phone, email and Skype to no avail.

25. Petitioner tried to contact Respondent's family members in Puerto Rico but initially did not get a response.

## CONCLUSIONS OF LAW AND LEGAL ANALYSIS

**I. The Hague Convention.**

The Hague Convention is a multilateral international treaty on parental kidnaping to which the United States and the United Kingdom, among others are signatories.

The goal of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *See* Hague Convention, Oct. 25, 1980, preamble, T.I.A.S. no. 11670, 19 I.L.M. 1501, 1501.  The Convention reflects "a

universal concern about the harm done to children by parental kidnaping and a strong desire among the Contracting States to implement an effective deterrent to such behavior." Feder v. Evans-Feder, 63 F.3d 217, 221 (3rd Cir. 1995). The Convention is "designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child." *Id*.

The Hague Convention applies where a child has been removed or retained away from his or her habitual residence in breach of the custody rights that the Petitioner (parent) was exercising at the time of the wrongful removal or wrongful retention. Hague Convention, Art. 3. The objects of the Convention are: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, Art. 1.

The United States has implemented the Hague Convention by enactment of the ICARA, 42 U.S.C. § 11601 *et seq*. ICARA vests state and district courts with concurrent jurisdiction over claims arising under the Convention and empowers those courts to order the return of wrongfully removed or retained children. *See* 42 U.S.C. § 11603. An ICARA hearing is not a custody hearing. *See* Blondin v. Dubois, 189 F.3d 240, 245 (2nd Cir. 1999) (under ICARA, a district court has "the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim"); Hague Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). An ICARA proceeding merely

determines which nation should hear the underlying custody claim. *See* <u>Blondin</u>, 189 F.3d at 245; <u>Cerit v. Cerit</u>, 188 F.Supp.2d 1239, 1243 (D. Hawaii 2002).

A petition under the Hague Convention requires the Court to determine whether the child has been "wrongfully removed or retained" within the meaning of the Convention. Petitioner has the burden of proving, by a preponderance of the evidence, wrongful removal or retention. 42 U.S.C. § 11603(e)(1)(A).

Pursuant to Article 3 of the Hague Convention, removal is wrongful under the Convention if:

    a)      it is in breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and

    b)      at the time of the removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or the retention.

In applying this provision, a court must ask four questions.

(1)      When did the removal or retention at issue take place?

(2)      Where was the child habitually resident immediately prior to the removal or retention?

(3)      Did the removal or retention breach the Petitioner's rights of custody under the law of the habitual residence?

(4)      Was the Petitioner exercising those rights at the time of the removal or retention?

Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001).

Therefore, a Petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence that:

(1)     the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought;

(2)     the removal or retention breached the Petitioner's custody rights under the law of the child's habitual residence;

(3)     the Petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention; and

(4)     the child has not attained the age of 16 years.

See Nicolson v. Pappalardo, 605 F.3d 100, 103 (1st Cir. 2010); Lops v. Lops, 140 F.3d 927, 936 (11th Cir. 1998); Pesin v. Osorio-Rodríguez, 77 F.Supp.2d 1277, 1284 (S.D.Fla. 1999); Méndez-Lynch v. Méndez-Lynch, 220 F.Supp.2d 1347, 1357 (M.D. Florida 2002); González-Locicero v. Nazor Lurashi, 2004 WL 1202729 (D.P.R. 2004) (unpublished opinion).

Once the Petitioner meets the burden of proving wrongful removal or retention, the child must be returned unless the respondent can establish by preponderance of the evidence one or more of four defenses:

(1)     the person having care of the child was not actually exercising the custody rights at the time of removal or retention, Hague Convention, Article 13a; or

(2)     the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child, Hague Convention, Article 13a; or

(3)     "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13, unnumbered paragraph; or

(4)     the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment." Hague Convention, Article 12.

Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that:

(5)     there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Article 13b; or

(6)     return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. Hague Convention, Article 20.

Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention. Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001); England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000).

Furthermore, each exception is to be applied narrowly. Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995); 42 U.S.C. Section 1160(a)(4).

## II.   Wrongful Removal.

We now proceed to apply the above principles to this case.  Two of the threshold issues of any Hague Convention case are not in dispute in the instant case, to wit, the child is under 16 years of age and the United Kingdom and the United States became signatories to the Hague Convention prior to the retention of the child in this case.

The issue of whether Petitioner has rights of custody under English law has already been determined in favor of Petitioner by the United States Court of Appeals for the First Circuit in its Opinion entered on February 1, 2013.  See Patrick v. Rivera-López, ___ F.3d. ___ (1st Cir.  2013), 2013 WL 388053. As such, we do not need to delve on this issue either.[6]

We thus need only to address which was the minor's habitual place of residence immediately prior to her removal and whether Petitioner was actually exercising his custody rights of the child at the time of his removal.

---

[6] The Court of Appeal's opinion was premised on the fact that Patrick alleged in his petition that L.N.R.'s habitual residence was the United Kingdom.  For purposes of the appeal, Rivera did not dispute this allegation. Therefore, Patrick's rights of custody were determined by the Court of Appeals with respect to United Kingdom law, under the judgment on the pleadings standard. Since we determine in this Opinion and Order that in fact L.N.R.'s habitual residence was the United Kingdom, and not Puerto Rico as alleged by Respondent, there is no need to discuss further the custody rights issue with respect to English law in light of the Court of Appeal's clear ruling.

### A.    Habitual Place of Residence.

We first need to determine whether the child's "habitual residence", immediately before the date of the alleged wrongful removal, was in the country to which return is sought, namely, the United Kingdom.

The Hague Convention does not define "habitual residence." Nevertheless, the First Circuit in Nicolson v. Pappalardo, 605 F.3d at 104 noted that a majority of the circuits approach the question of habitual residence beginning "with the parents' shared intent or settled purpose regarding the child's residence." However, the Circuit courts are divided on the extent that parental intent should factor into the acquisition of a habitual residence. The First, Second, Fourth and Seventh Circuits[7] place the primary focus upon parental intent, following the Ninth Circuit's decision in Mozes v. Mozes, 239 F.3d at 1067. The focus is on the parents' last shared intent in determining habitual residence. Koch, 450 F.3d at 715 (same); Gitter, 396 F.3d at 131-133 (finding the Mozes opinion "particularly instructive" in determining habitual residence by considering the intentions of the parents as of the last time their intentions were shared).

Under the Mozes' approach, the first inquiry when deciding whether a new habitual residence has been acquired is: did the parents demonstrate a shared intention to abandon the former habitual residence. Id. at 1075. This intent could develop during the course of the stay and need not be settled at the time of departure.  Id. The second inquiry under the

---

[7]  Zuker v. Andrews, 1999 WL 525936 (1st Cir. 1999) (unreported opinion); Gitter v. Gitter, 396 F.3d 124 (2d Cir. 2005); Maxwell v. Maxwell, 588 F.3d 245 (4th Cir. 2009); Koch v. Koch, 450 F.3d 703 (7th Cir. 2006); Mozes v. Mozes, 239 F.3d at 1067.

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 15

<u>Mozes</u>' rationale is whether there has been a change in geography for an "appreciable period of time" that is "sufficient for acclimatization." *Id.* at 1067 (citing <u>Federer v. Evans-Federer</u>, 63 F.3d 217, 224 (3rd Cir. 1995)).[8]   These are questions of fact to which appellate courts grant deference to the district court.  *Id.* at 1075-76.

Based on the testimonies and the evidence presented at trial, after assessing credibility, we find the parents in this case demonstrated a shared intention to abandon the former minor's habitual residence in Puerto Rico.  As such, the habitual residence of L.N.R. immediately before her removal was the United Kingdom.  We explain.

It is uncontested Respondent traveled to the United Kingdom with her children on January 11, 2011 voluntarily. At said moment, Petitioner was already residing in the United Kingdom and was not physically in Puerto Rico.  As such, Respondent took the plane to the United Kingdom with her children without coercion. Respondent testified on cross-examination that she trusted Petitioner and believed everything would be "ok" in the United Kingdom.

Respondent testified that  she agreed to travel to United Kingdom on January 11, 2011 until February 28, 2011 when she would return to Puerto Rico pursuant to her return travel ticket.  However, Respondent testified that February 28, 2011 passed by and she stayed in the United Kingdom because Petitioner convinced her but her plan was to return

---

[8] Other circuits have declined to make the issue of parental intent dispositive and have focused instead upon the degree of the child's settlement in determining the issue of habitual residence. *See* <u>Stern v. Stern</u>, 639 F.3d 449 (8th Cir. 2011); <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280 (3rd Cir. 2006); <u>Robert v. Tesson</u>, 507 F.3d 981 (6th Cir. 2007); <u>Friedrich v. Friedrich</u>, 983 F.2d 1396 (6th Cir. 1993).

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 16

to Puerto Rico eventually where her family is located. [9] It is uncontested Respondent did not take the plane on February 28, 2011, as per her return airline ticket, and decided to remain in the United Kingdom because Petitioner convinced her to stay and she agreed to stay but allegedly for not more than one year. To this effect, Petitioner testified he had to buy two way tickets when Respondent and the children traveled to the United Kingdom in January 11, 2011 because, since they were not permanent residents, he was not allowed to buy one-way tickets.

It is also uncontested that prior to leaving for the United Kingdom, Respondent filed on June 13, 2010 a relocation case in the Puerto Rico's state court in Fajardo to acquire authorization from the local Court to relocate her son L.D.R. from Puerto Rico to the United Kingdom.  The local Court authorized the relocation of L.D.R. on December 11, 2010.  This procedure was needed because the father of L.D.R. was not in agreement for Respondent's son to reside in the United Kingdom.  This action is consonant with Petitioner's assertion at trial that in order for the family to leave for the United Kingdom it had to be "all of us or none of us."

Respondent's alleged intention to go to the United Kingdom for a limited period of time only until February 28, 2011 as she claimed at the trial, is belied by her actions prior to traveling to the United Kingdom by judicially seeking in Puerto Rico the relocation of her

---

[9] Respondent testified Petitioner told her that, after they got married, they would move to the United Kingdom for a period of time until Petitioner would make enough money to buy a house in the Dominican Republic were they would reside. The evidence shows Respondent was aware Petitioner was not employed when she traveled to the United Kingdom and was still trying to finish his studies. Thus, making enough money for Petitioner to eventually buy a house to reside in the Dominican Republic would take years, thus, debilitating this contention.

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 17

son L.D.R to the United Kingdom.  If her intentions were to travel to the United Kingdom for a definite short period of time or for vacation purposes with no intent of relocation, no court authorization would have been required for her son L.D.R.

We further note that Respondent and her children left Puerto Rico to the United Kingdom with visitor's visas which were valid for her and her children for six (6) months. When those six (6) months expired, they would be illegally in the United Kingdom.  Instead of returning to Puerto Rico, upon expiration of the six (6) months visitor's visa, Respondent took affirmative actions in the United Kingdom to obtain a residence card for her and her children.  This is shown by Exhibit 8 which contains the United Kingdom Border Agency certification of application for Permanent Residence Cards.  This process was undertaken by Petitioner on behalf of his wife and children inasmuch as he was the citizen of the European Union and had standing to do so. However, Respondent was aware of the process and took affirmative steps to achieve its goal.  As a matter of fact, on August 3, 2011, Respondent and L.N.R. obtained each a "Residence Card of a Family Member of an SEA National" valid until August 3, 2016.   *See* Trial Exhibits 13A and 13B.  To this effect, Respondent admitted in cross-examination she had to take a photograph of herself and her children to affix them to the application forms and she had to sign the application forms.

The evidence also shows Respondent was granted authorization in June 2011, that is prior to her residence card being issued, to work in the United Kingdom but she decided to be a housewife.  Respondent testified being aware that Petitioner was receiving "job

seekers" allowance and was trying to find a job. Petitioner was able to secure some odd jobs and was able to find a house for the family to reside.

The uncontested evidence shows Respondent and L.N.R. were registered in the United Kingdom for health services, received child benefit, child tax credit and health start coupons there. L.N.R. did not attend school in the United Kingdom due to her young age but attended playgrounds, accompanied her mother to take her brother to school, accompanied her mother to her English lessons and participated of the family activities as shown in the photographs admitted into evidence as Trial Exhibit 4. The family also attended regular Church services on Saturdays. The family had contact with Petitioner's brother who resides in the United Kingdom and is a pastor of the Church they attended at some point in time.

The evidence also shows Respondent's son L.D.R. could not start school as soon as they traveled to the United Kingdom on January 2011 because he needed some permits which took some time. First they had to apply for a school permit, get the approval of the permit, submit the application for schooling and receive the placement in a school. All this process was undertaken successfully by Petitioner and Respondent was aware of the same. When the new school year started on October 2011, L.D.R. started school in the United Kingdom. (Trial Exhibit 5). Respondent bought school uniforms for L.D.R. to attend school and Respondent spoke directly with his teachers during the school year. As part of the normal daily routine of the family, Respondent regularly took his son to school and picked him up while always taking L.N.R. with her.

<u>Lisandro Patrick v. Noelia Rivera-López</u>
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 19

All the actions taken by Respondent before and after traveling to the United Kingdom on January 2011 are consonant with Petitioner's testimony at trial.  To this effect, Petitioner testified he agreed with Respondent after their marriage that they would reside permanently in the United Kingdom because he is a Dutch citizen and, as such, a citizen of the European Union where they could establish a better residence.  Moreover, Petitioner came to Puerto Rico to study and was earning $750.00 which was not enough to provide for the family. Petitioner and Respondent agreed he would travel first to the United Kingdom where he would secure a family house and she would join him with the children. As a matter of fact, Petitioner was not in Puerto Rico when L.N.R. was born but they communicated via mobile phone, email and other social networks.  Petitioner traveled to Puerto Rico on March 2010 to meet L.N.R. and make plans to marry Respondent.  They eventually married in Puerto Rico on June 8, 2010 at a wedding which was not secret and some of Respondent's family members attended. Petitioner clarified he never told Respondent he would be promptly buying a house in Santo Domingo for them to reside but for their eventual retirement.   Buying a house in Santo Domingo quickly was not economically feasible inasmuch as he was still studying and would not be able to raise the amount of money required to buy a house in the Dominican Republic.

Moreover, we note that pursuant to the evidence presented at trial, Respondent had her family in Guánica, Puerto Rico where she was born and resided all her life with.[10]

---

[10] Respondent testified on cross-examination she had an argument and/or disagreement with her mother but the mother apologized to her. That is why Respondent was residing at some point in Puerto Rico at the house of a Pastor. In addition, Respondent indicated her mother wanted to keep her son L.D.R. in Puerto Rico.

However, no evidence was presented as to Respondent having any financial ties to Puerto Rico such as a bank account, real estate property, an employment, investments in Puerto Rico or the like to which she would be coming back to with her children.[11]  No evidence was presented either as to the daily routine Respondent had with L.N.R. in Puerto Rico and whether she had a voter's registration card in Puerto Rico or a Puerto Rico driver's license. As a matter of fact, Respondent has no financial means in Puerto Rico inasmuch as she was not employed, lived at her parent's residence, and received economic wealth fare from the government including PAN (nutritional assistance program), food coupons, WIC (food voucher program) and the "Reforma" (reform) health government plan.[12]  Respondent was also dependent on financial assistance provided by Petitioner of $100.00 monthly.  As to L.N.R., besides sharing with her mother's family, no evidence was presented either as to her daily routine in Puerto Rico and any other ties, activities, schooling and friends of the minor in Puerto Rico.

The uncontested evidence further demonstrates that, by the time of the alleged wrongful removal, substantial time had passed inasmuch as L.N.R. had been living in the United Kingdom for one year and almost two months, and there was a clear change in geography. Petitioner, with Respondent's knowledge and acquiescence, secured a home for the family in the United Kingdom in Bracknell, one hour away from London, which was in

---

[11]  Respondent testified there was a bank account at the Banco de Santander de Puerto Rico for the child support the father of her son provided to L.D.R.  It is undisputed L.D.R. is not object of the instant petition inasmuch as Petitioner is not his father.

[12]  Respondent testified these benefits were left "stand by" when she traveled on January 11, 2011 to the United Kingdom with her children but were later cancelled by the passage of time.

a peaceful neighborhood in which public transportation and a school were available.  Also, close by there was a hospital, supermarket, parks and nursery school.  Petitioner and Respondent applied and obtained a national insurance number and child benefits for both children in the United Kingdom.  Respondent and their children obtained their residence cards valid for five years, L.D.R. was attending school, Respondent was taking English lessons, Petitioner was doing odd jobs and actively seeking an employment.

Based on the foregoing, we find Petitioner has established by preponderance of the evidence that the United Kingdom was the minor L.N.R.'s habitual residence prior to the alleged wrongful removal by Respondent. The parties, by their actions prior and during their residence in the United Kingdom, have so demonstrated.

Finally, we note that any intention or hope that Respondent in this case may have had to return to Puerto Rico with her children in the future at any given point in time (before or after leaving for the United Kingdom on January 2011) does not prevent a new residence from being established.  The hope has to be viewed in light of what the family actually did and the larger scope of what the parents intended. Koch, 450 F.3d at 717-19 (parents' shared intent, perhaps better described as a hope, at the moment of departure and for some period thereafter, to return someday to the United States had to be viewed in light of what the family actually did and the larger scope of what the parents intended, for purposes of determining "habitual residence" under the Hague Convention and the ICARA).

Even if we were to credit Respondent's version that her travel to the United Kingdom was temporary, as the Mozes' court noted, one need not have a settled intention at the

moment of departure; the intention may coalesce during the course of a stay abroad originally intended to be temporary. 239 F.3d at 1075.  In the instant case, Respondent through her actions, above summarized, clearly agreed to remain in the United Kingdom for an indefinite, extended period of time.  Thus making the United Kingdom the minor's habitual place of residence.

Hence, taking into account the stipulated facts and the evidence presented at the trial after accessing credibility, we conclude that L.N.R. was a habitual resident of the United Kingdom immediately prior to her removal to Puerto Rico. Moreover, there has been a change in geography for an "appreciable period of time" that is "sufficient for acclimatization."


### B.    Petitioner was Exercising his Custody Rights.

The evidence above summarized, along with the exhibits and the testimony at trial, unequivocally shows Petitioner was exercising his custody rights within the meaning of Articles Three and Five of the Convention, in that Petitioner is the father of L.N.R., has exercised as her caretaker and main economic provider since birth and has been actively involved in all aspects of L.N.R.'s life since birth.  Petitioner had been residing with Respondent and both children in the United Kingdom for over a year and was clearly exercising his custody rights.  Petitioner was the main bread winner and was actively seeking for a better job. It is true that Petitioner was not in Puerto Rico when L.N.R. was born but they communicated via mobile phone, email and other social networks. Petitioner

<u>Lisandro Patrick v. Noelia Rivera-López</u>
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 23

had already moved to the United Kingdom to prepare for the arrival of the family and secure a home.  As a matter of fact, Petitioner traveled to Puerto Rico on March 2010 to meet L.N.R. and make plans to marry Respondent.  Petitioner and Respondent eventually married and the fact that Petitioner moved prior to make all the arrangements for the family to move to the United Kingdom does not mean that he relinquished his exercise of his custody rights.[13]

In addition, it is uncontested that Petitioner is L.N.R.'s father.  (Docket No. 84-1, p. 4).  Petitioner's paternity and the exercise of his custody rights of L.N.R. are further evidenced by the affidavit he subscribed which was witnessed by Respondent.  (*See* Trial Exhibit 1).

In view of the foregoing, Petitioner has met his burden of proving there was a wrongful removal under the Convention.  As such, the minor L.N.R. must be returned to the United Kingdom unless Respondent can establish some defenses we now address.

**III.   Respondent's Defenses.**

**A.   Respondent's Defenses to be Proven by <u>Preponderance of the Evidence</u>.**

(1)   the person having care of the child was not actually exercising the custody rights at the time of removal or retention, Hague Convention, Article 13a; or

---

[13] We recognize that a parent need not have constant physical custody and control of a child in order to be exercising his/her rights; a parent may place a child with another party, such as a grandparent. This may by itself constitute the exercise of custody rights. *See* <u>Sampson v. Sampson</u>, 267 Kan. 175, 975 P.2d 1211 (1999).

(2)    the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child, Hague Convention, Article 13a; or

(3)    "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13, unnumbered paragraph; or

(4)    the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment." Hague Convention, Article 12.

As already ruled above, Petitioner was exercising his custody rights over L.N.R. at the time of removal. Hague Convention, Article 13a.  Thus, Respondent did not meet this defense.

As to the second defense, Respondent raised in her answer to the petition that Petitioner consented to L.N.R.'s return to the United States.[14]  However, the evidence presented at trial pursuant to Respondent's own testimony under oath shows otherwise. Respondent admitted in cross-examination that on March 6, 2012 she located her passport and those of her children and "secretly" left the United Kingdom with her children. Respondent admitted she never told Petitioner what she was going to do or that she was going to take a plane and leave the United Kingdom for Puerto Rico.  This is consonant with

---

[14] The term "consent" refers to permission before the child is removed whereas "acquiescence" refers to conduct after the removal. Consent can be established by either statements or conduct indicating that a parent has given consent to the removal for an indefinite period of time or permanently. This defense, like others, is to be interpreted narrowly. *See* In re Kim, 404 F.Supp. 2d 495, 512 (S.D.N.Y. 2005).

Petitioner's testimony that: he was never told by Respondent that she was leaving the United Kingdom with the children on March 6, 2012, he never consented to his daughter being removed to Puerto Rico on March 6, 2012 and never talked about that possibility with Respondent.

That being the case, if Respondent never told Petitioner of her plan to leave the United Kingdom with L.N.R. for Puerto Rico on March 6, 2012, it is clear he could not have consented to L.N.R.'s return to the United States. Moreover, no evidence was presented of statements or conduct of Petitioner to show his alleged consent prior to the removal or acquiescence after the removal. The evidence shows to the contrary, that is, that Petitioner never consented or acquiesced to the child's removal to the United States. As such, Respondent has failed to prove, by preponderance of the evidence, that Petitioner consented or acquiesced to the minor's removal.

The third defense above mentioned is not applicable to this case due to the young age of minor L.N.R. (currently three and a half year old) which prevents her from objecting to being returned. It is obvious that a three and a half year old has not attained an age and degree of maturity at which it is appropriate to take into account her views. Hague Convention, Article 13, unnumbered paragraph.

Finally, as to the fourth defense, it is also inapplicable to this case inasmuch as it is uncontested the Convention proceedings were immediately commenced by Petitioner on March 9, 2012. Thus, the petition did not commence more than one year after the date of

the wrongful removal or retention and "the child is now settled in its new environment."

Hague Convention, Article 12.

**B.     Respondent's Defenses to be Proven by <u>Clear and Convincing</u> <u>Evidence</u>.**

Additionally, a court is not bound to order the return of a child if Respondent demonstrates by <u>clear and convincing evidence</u> that:

(5)     there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Article 13b; or

(6)     return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. Hague Convention, Article 20.

Respondent in the instant case has asserted as an affirmative defense in her answer to the petition that returning the child to the United Kingdom would expose her to a grave risk of harm.  However, we find Respondent has not proven this defense by clear and convincing evidence.

Article 13(b) provides:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Hague Convention, art. 13(b).

The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. *See* Núñez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995).  Courts are not to engage in a custody determination, so "[i]t is not relevant … who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home … and terminate her marriage." Núñez-Escudero, 58 F.3d at 377.

Under Article 13(b), "grave" means a more than serious risk, but it need not be an immediate risk. *See* Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002).  The situation contemplated by Article 13(b) would include sending a child back to a "zone of war, famine or disease" as well as "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996) (indicating that an intolerable situation would also arise if a parent sexually abuses a child).

It is universally accepted that the "grave risk" defense is subject to a narrow interpretation.

Respondent testified on direct examination she was the object of psychological and physical abuse by Petitioner. Respondent detailed in her testimony how Petitioner controlled her prior and after their marriage as to where she would reside in Puerto Rico when he left to the United Kingdom;  yelled at her and used foul language while she was pregnant with L.N.R. because he did not want anyone to know she was pregnant due to his

religious beliefs; had constant arguments and discussions with her for different reasons; wrote her emails in which he insulted her and used bad words; was physically and emotionally abusive and aggressive with her prior and after the family left to the United Kingdom.  Respondent testified her family was aware of Petitioner's behavior and that explains why Petitioner did not want any relationship with her family.   However, Respondent testified she forgave him on multiple occasions because she loved him, to the point they eventually married even though she was cognizant of his behavior.  The evidence shows Petitioner's aggressive behavior ensued prior and after the marriage both in Puerto Rico and in the United Kingdom. Respondent testified that, due to Petitioner's constant mistreatment and aggressive behavior, their relationship was in essence a rocky road.[15]

In turn, Petitioner denied any possible abuse or mistreatment towards his wife and testified he was the object of physical abuse by his wife on two occasions.

If we credit as true Respondent's allegations of domestic violence and aggressive behavior towards her, there was no evidence presented at the trial that said alleged abuse was directed to L.N.R. or her brother or that L.N.R. was present during the alleged abuse and understood at her young age what was going on to be affected by it.  No evidence whatsoever as to any physical or emotional abuse to the children was presented.  No evidence that L.N.R. would be exposed to physical or psychological harm if returned to the

---

[15] Both Petitioner and Respondent also testified about a major incident which occurred the night of March 2, 2012 in which Petitioner says he took a knife from a kitchen drawer not to intimidate Respondent and placed it on the kitchen table while they were arguing. Petitioner wanted to know if the anger expression Respondent had in her face was what he thought it was. In turn, Respondent stated Petitioner took out the knife and gave it to her in her hand. This is the episode which led Respondent to decide to leave the United Kingdom with her children on March 6, 2012. In any event, Petitioner testified it was "stupid" for him to take out the knife, he should not have done it and he apologized.

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 29

United Kingdom was offered either.   Moreover, we note Respondent testified that, even though she was allegedly abused, she always forgave Petitioner because she was in love with him and never took affirmative steps to leave him and move back to Puerto Rico.  At no time during the alleged abuse, did Respondent call the local Police in the United Kingdom, filed a complaint against Petitioner, sought guidance or counseling, and/or complained to the authorities about Petitioner's behavior.[16]

While there has been violent behavior between the parties in this case, there are no allegations of direct physical or psychological abuse against the children. The court in Whallon v. Lynn, 230 F.3d 450 (1st Cir. 2000), where there were allegations of abuse between the parties, found that those instances did not constitute a risk of "grave harm," as they were not directed at the child nor did they have the intensity of those of petitioner father in Walsh.[17] The record in this case fails to establish a "grave risk" defense to the children's return under Article 13(b). Furthermore, such a finding in this case would serve to undermine the purpose of the Convention itself. See Aldinger v. Segler, 263 F.Supp. 2d 284, 289 (D. Puerto Rico 2003).

---

[16] Respondent testified she tried to obtain a protection order at the local Puerto Rico court against Petitioner, due to fear against him, when she arrived in Puerto Rico on March 2012 but the same was not granted inasmuch as Petitioner was not in Puerto Rico.

[17] The court in Walsh v. Walsh, 221 F.3d 204 (1st Cir. 2000), held that an estranged wife who had wrongfully brought the children to the United States from their habitual residence in Ireland showed by clear and convincing evidence that the children faced a grave risk of exposure to physical or psychological harm if they were returned to her husband in Ireland, as would preclude the return of the children under the Hague Convention on the Civil Aspects of International Child Abduction where the husband had a long history of spousal abuse. Walsh v. Walsh, 221 F.3d at 222 presented a fact pattern in which petitioner's violent behavior and disregard of the court's orders "…went well beyond what one encounters even in bitter divorce and custody contexts."

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 30

No evidence was presented the return of L.N.R. to the United Kingdom will expose her to "zone of war, famine or disease."  No evidence was presented either that minor L.N.R would be exposed to serious abuse or neglect, or extraordinary emotional dependence, because the court in the country of habitual residence (the United Kingdom) is incapable or unwilling to give the child adequate protection. Friedrich v. Friedrich, 78 F.3d at 1069.

As to the final defense, Respondent has not claimed and there is no evidence that the children's or Respondent's "human rights and fundamental freedoms" would be at risk if they were to return to the United Kingdom. This determination is in agreement with the established interpretation that Article 20 was to be "restrictively interpreted and applied ... on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process."

## CONCLUSION

In sum, Petitioner has established by a preponderance of the evidence that Respondent's removal of the minor L.N.R. to the United States was wrongful, he was exercising his rights of custody at the time and minor L.N.R.'s habitual place of residence was the United Kingdom. Respondent has not shown by preponderance of the evidence that Petitioner consented and has not shown by clear and convincing evidence that the minor L.N.R.'s return to the United Kingdom poses a grave risk of being exposed to physical or psychological harm. Because Respondent has not established a valid defense in support of

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 31

the removal of the minor to the United States, the minor L.N.R. must be returned to the United Kingdom in compliance with the Hague Convention under the following provisions[18]:

1.  Petitioner's Petition for Return of Children (Docket No. 1) is GRANTED.

2.  Respondent is ordered to surrender custody of minor L.N.R. to Petitioner or to any person designated by Petitioner no later than twelve noon on March 11, 2013, to travel with the minor for return to the United Kingdom with Petitioner or his designee. Counsel for Petitioner shall coordinate arrangements with Respondent and her attorney.

3.  Petitioner should move the court for the return of minor L.N.R.'s passport once the travel arrangements to the United Kingdom are final.

4.  Minor L.N.R. shall be returned to the United Kingdom at Petitioner's expense. Respondent may accompany Petitioner and the child to the United Kingdom if she chooses, or may join Petitioner and the child in the United Kingdom at a later date.

---

[18] These provisions are ordinary logistic considerations tailored by the Court to restore the *status quo ante* and to expedite the return of minor L.N.R. to the United Kingdom imposing reciprocal obligations on both parents, taking into account Petitioner has been the main bread winner for the family. The parties have not requested a hearing, in the event the petition was granted, and have not submitted any proposed "undertakings" to this Magistrate Judge. The undersigned recognizes a hearing could be set for the parties to try to reach an agreement as to the return of the minor to the United Kingdom. However, said hearing is not deemed convenient under the particular circumstances of this case inasmuch as the holding of the same, taking into account the limited availability of the parties and the time constraints, may delay the return of minor L.N.R. in contravention to the purpose of the Convention. We note that none of the provisions herein included condition the return of the minor on a foreign court's entry of an order, thus, they do not raise any comity concern. *See* Danaipour v. McLarey, 286 F.3d 23. In any event, to avoid further litigation, the undersigned is willing to entertain, if the parties so request, any further provision not included herein or any change to the provisions herein included, which the parties believe are necessary, for the prompt return of the minor to the United Kingdom. Said request should be done in writing within 48 hours from the issuance of this Opinion and Order.

5.      Because Respondent has been the minor's's primary caretaker and Petitioner has been her main source of financial support, Respondent may continue to live in the marital residence in the United Kingdom and Petitioner move to another location (*ie*. Petitioner's brother's house), as offered by Petitioner during the trial.  Petitioner shall continue to provide Respondent and minor L.N.R. with adequate maintenance and support, until such time as the courts in the United Kingdom make other arrangements for the parties or is otherwise ruled upon by pertinent authorities in the United Kingdom.

6.      Petitioner shall dismiss any pending criminal proceedings in the United Kingdom against Respondent or not seek such a criminal proceeding, relating in any way to the removal or retention of the child insofar as the present petition.  Petitioner shall take no steps to pursue or re-initiate any such charges; and he shall take all steps within his lawful power to see that such charges are not pursued, initiated or re-initiated.

7.      The issue of provisional or permanent custody of the child is to be determined by the courts in the United Kingdom, as the child's habitual place of residence.

8.      The Clerk shall enter Judgment accordingly.  Any request to stay an order in regard to this proceedings shall be sought with the Court of Appeals for the First Circuit.

Lisandro Patrick v. Noelia Rivera-López
Civil No. 12-1501 (CVR)
Opinion and Order
Page No. 33

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 26th day of February of 2013.

S/ CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE